**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STEEL WORKERS LOCAL 12-369; DAVID ROBERTS,

*Plaintiffs*,

and

STEPHANIE B. GREEN,

*Plaintiff-Appellant*,

v.

UNITED STEEL WORKERS
INTERNATIONAL; UNITED STEEL
PAPER AND FORESTRY RUBBER
MANUFACTURING ENERGY ALLIED
INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION; AFL-CIO-
CLC; HANFORD ATOMIC METAL
TRADES COUNCIL; AFL-CIO; DAVE
MOLNAA, husband and the marital
community thereof; VINCE STROOPS,
husband and the marital community
thereof; JANE DOE STROOPS, wife
and the marital community thereof;
KIRK DOMINA, husband and the
marital community thereof; JANE
DOE DOMINA, wife and the marital
community thereof; VICTOR CRUZ,
husband and the marital community

No. 10-35450

D.C. No.
2:07-cv-05053-
RHW

OPINION

thereof; JANE DOE CRUZ, wife and the marital community thereof; JIM WOODWARD, husband and the marital community thereof; JANE DOE WOODWARD, wife and the marital community thereof; CHERRIE MILLER, wife and the marital community thereof; JOHN DOE MILLER, husband and the marital community thereof; MARGIE MEYERS, wife and the marital community thereof; JOHN DOE MEYERS, husband and the marital community thereof; JIM OROSCO, husband and marital community thereof; JANE DOE OROSCO, wife and the marital community thereof; KAREN ALEXANDER, wife and the marital community thereof; JOHN DOE ALEXANDER, husband and the marital community thereof; RANDY KNOWLES, husband and the marital community thereof; JANE DOE KNOWLES, wife and the marital community thereof; JANE DOE MOLNAA, wife and the marital community thereof,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Washington
Robert H. Whaley, Senior District Judge, Presiding

Argued and Submitted
April 8, 2013—Seattle, Washington

Filed September 6, 2013

Before: Dorothy W. Nelson, A. Wallace Tashima,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Tashima

## SUMMARY[*]

**Labor Law**

The panel affirmed the district court's judgment after bench trial in a former local union president's action alleging race and gender discrimination and retaliation for having engaged in protected speech under the Labor-Management Reporting and Disclosure Act.

The plaintiff, a nuclear chemical operator at the Hanford Nuclear Reservation, was the elected president of her local union. She sued the local union, the international union, the Hanford Atomic Metal Trades Council, and HAMTC's president.

Affirming the dismissal of claims under LMRDA § 609, the panel held that this provision does not protect union officers from discipline suffered in their official capacities.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel also affirmed the district court's judgment after trial on claims brought under LMRDA §§ 101 and 102, Labor Management Relations Act § 301, 42 U.S.C. § 1981, Title VII, and the Washington Law Against Discrimination. The panel held that the district court did not clearly err in finding that the defendants did not engage in unlawful retaliation or discrimination because, rather than reflecting discriminatory or retaliatory animus, the actions taken against the plaintiff were attributable to the competing interests of rival factions within the local, or the need to alleviate the tension created thereby.

## COUNSEL

Natalie R. Ram (argued) and Deanne E. Maynard, Morrison & Foerster LLP, Washington, D.C., for Plaintiff-Appellant.[**]

Danielle E. Leonard (argued), Peter D. Nussbaum, Matthew J. Murray, Altshuler Berzon LLP, San Francisco, California; Jay Smith and Joshua F. Young, Gilbert & Sackman, Los Angeles, California, for Defendants-Appellees United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.

Daniel Hutzenbiler (argued) and Richard H. Robblee, Robblee Detwiler & Black PLLP, Seattle, Washington, for Defendants-Appellees Hanford Atomic Metal Trades Council, David and Jill Molnaa.

---

[**] The court appreciates and thanks counsel for her *pro bono* representation of Plaintiff-Appellant on this appeal.

**OPINION**

TASHIMA, Circuit Judge:

Plaintiff Stephanie Green, formerly President of the United Steel Workers Local 12-369 (the "Local"), brings the instant action against the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the "International"), the Hanford Atomic Metal Trades Council ("HAMTC"), and David Molnaa (collectively, "Defendants"). Green pursues claims for discrimination on the basis of race and gender and retaliation for having engaged in protected speech under the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 *et seq.* The district court dismissed Green's claims under LMRDA § 609, but permitted the remainder of her claims to proceed to trial. Following a ten-day bench trial, the district court entered judgment in favor of Defendants, finding that they had not unlawfully discriminated or retaliated against Green.

On appeal, we hold that LMRDA § 609 does not protect union officers from discipline suffered in their official capacities, and therefore the district court properly dismissed Green's claims under this provision. We further affirm the district court's judgment entered after trial.

## I.  BACKGROUND

### A.  Factual Background

As underscored by the length of the trial below, the factual history of this case is extensive to say the least. We

focus on the actors, events, and controversies most relevant to Green's claims.

### 1. Parties

Green is a nuclear chemical operator ("NCO") at the Hanford Nuclear Reservation in Richland, Washington. In November 2005, Green was elected President of the Local, making her the first female and first African-American President in the Local's history. Green was reelected in May 2009, and she continued to serve as President at the time of trial.

The Local is an amalgamated local that is headquartered in Richland and maintains branches in the states of Washington, Hawaii, and Oregon. As of 2007, over half of the Local's 1400 members were, like Green, employed at the Hanford Reservation.

A unique representation arrangement exists for members employed at Hanford. The Local and fourteen other unions with members at Hanford comprise HAMTC. HAMTC, and not the constituent unions, acts as the collective bargaining agent for Hanford union employees. Defendant Molnaa has served as President of HAMTC since 2005.

The International is the parent organization of the Local. It assumed this status in April 2005 after merging with the Local's previous parent, the Paper Allied-Industrial Chemical and Energy Workers International Union ("PACE"). During the period relevant to this suit, Vincent Stroops was a staff representative for the International, serving in this capacity as a liaison between the International and the Local. Jim Woodward was a Subdistrict Director for the International,

covering the district to which the Local belongs. Woodward reported to Terry Bonds, who served as District Director for the International. Leo Gerard is President of the International.

### 2. Decertification Effort in 2002

Green was embroiled in disputes within the Local well before being elected President. In 2002, Green and other NCOs formed a group that attempted to decertify the Local as their representative. According to the district court, the NCOs contended that the Local was not adequately serving their interests relative to the other bargaining units within the Local.

Stroops, then acting as a staff representative for PACE, filed formal charges against Green and the other NCOs for violating the PACE Constitution. The charges against Green were dismissed because she was not provided proper notice, but other members of the group were found guilty and suspended from the Local for various periods of time.

### 3. Steward Election in 2005

In January 2005, Green won an election to serve as "steward" for a subset of NCOs at the Hanford Reservation. Following the election, a dispute arose as to the scope of this position. The notice for the election had listed the relevant position as covering the "K-Basin," which includes three separate buildings – "K-East," "K-West," and "CVD." Green's predecessor as steward, Kirk Domina, had been recognized as steward for the entire K-Basin. However, after Green won the election, Karen Alexander, one of the Local's staff representatives and a member of its Executive Board,

informed Green that her position covered only the K-West building and that there was no steward position for the entire K-Basin. Randy Knowles, then-President of the Local, later reiterated this position.

In May 2005, the Local agreed to recognize Green as the point of contact for the entire K-Basin. Nevertheless, in July 2005, Green filed internal charges with the Local's Executive Board, alleging that the events surrounding the steward election reflected discrimination attributable to her race and gender. Green filed a similar complaint with the Equal Employment Opportunity Commission ("EEOC") in October 2005. On May 24, 2007, the EEOC issued a determination that there was cause to believe that Green's allegations were meritorious.

## 4. Election as President and Union Governance Disputes

Green was elected President of the Local in November 2005. When the election results were received, Karen Alexander apparently commented: "We'll just let the fucking niggers run it then. See if they can do any better than I did." When the Local's leadership ordered that the election be rerun, Green appealed the decision to the International. In April 2006, the International overturned the decision and ordered that Green be seated as President.

On May 4, 2006, Green presided over her first Executive Board meeting as President. Tensions rose when Green announced that, contrary to prior practice, certain decisions by the Executive Board would be subject to ratification by union members at the Local's monthly membership meetings. Because these membership meetings were held in Richland,

NCOs at the Hanford Reservation comprised a disproportionate percentage of those able to attend, while members from outlying branches such as the Spokane branch were inevitably underrepresented. Indeed, in response to Green's announcement, an Executive Board member from the Spokane branch warned Green that the new policy would lead to the Local losing its Spokane units. Green's response to this warning was simply, "OK."

As was likely the intended effect, after the new policy was implemented, decisions of the Executive Board were regularly overturned at the monthly membership meetings in Richland.

### 5. Decertification of Spokane Units

The warning Green received at the Executive Board meeting proved to be correct: two units of the Spokane branch – pharmacists and technicians – ultimately decided to decertify from the Local. Green contends, however, that she was unduly marginalized in this process.

In July 2006, the International arranged a meeting with the Spokane pharmacists to discuss the unit's desire to decertify. Green traveled to Spokane to participate in the discussions, but upon her arrival, an official with the International informed her that she would not be allowed to attend the meeting. The pharmacists eventually decertified from both the Local and the International. In June 2007, the technicians at the Spokane branch decertified from the Local, but were permitted to form a new local within the International. Again, Green was not included in the discussions concerning the unit's decertification efforts.

### 6.  Signature Authority

After Green's election, a controversy developed over whether Green had "signature authority" with respect to communications with HAMTC.  Locals can only communicate with employers at Hanford through HAMTC, and HAMTC will only forward certain documents if the documents have been signed by an official for the local who has signature authority.  Initially, Molnaa, the President of HAMTC, refused to recognize Green's signature authority. Molnaa would instead return documents that had been signed by Green to Karen Alexander (to recall, one of the Local's staff representatives) and have Alexander add her signature. Molnaa testified that he would only recognize Green's signature authority if she were a staff representative or if a staff representative told him that she had such authority. Green declined, on principle, to ask Alexander to convey to Molnaa that Green should be afforded the authority.  Green notes that Molnaa recognized the signature authority of prior presidents, but Defendants counter that those presidents also had been staff representatives.

The dispute was resolved in January 2007 when Stroops, acting on behalf of the International, requested that Molnaa recognize Green's signature authority. Molnaa thereafter recognized Green's authority.

### 7.  Maki Commission

#### a.  Initial Maki Hearing and Report

In December 2006, a group of Local officers and employees, led by Executive Board member Margie Myers, wrote to International President Gerard and levied a host of allegations against Green.  The group alleged that Green had failed to uphold her duties as President, misappropriated funds, acted in violation of the relevant constitutions and bylaws, falsified records, harassed officers, and failed to represent the union.

In response to the allegations, Gerard appointed International representative Thomas Maki to investigate the charges.  Maki conducted a three-day hearing in February 2007.  On May 24, 2007, Maki issued a report clearing Green of any wrongdoing.  Maki further concluded that Green and her ally Dave Roberts had done nothing to warrant either their removal from office or placing the Local under an administratorship.

#### b.  Green's 2007 EEOC Complaint

On February 14, 2007, shortly before Maki's three-day hearing, Green filed a second complaint with the EEOC alleging that she was experiencing discrimination on the basis of her race and gender.  The International hired the law firm of Gilbert & Sackman to prepare a response to the charges. On April 23, 2007, the firm submitted a response on behalf of both the International and the Local.

Gilbert & Sackman submitted invoices to the Local for the work done in preparing this response, but at its April 2007 general membership meeting, the Local voted not to authorize funds for the fees. Green contends that she left the room prior to the debate over whether to authorize the payments.

### c.   Second Maki Report

On August 10, 2007, Maki issued an amended version of his report. The body of the report, which addressed the specific allegations levied by Myers in December 2006, was identical to the previous version issued in May. Maki, however, amended the conclusion of the report to recommend that the Local be placed under an administratorship.

Maki cited the following reasons for this new recommendation: (i) the Local had failed to process internal grievances filed by certain members; (ii) Green had violated the Local's bylaws by removing members of committees without the Executive Board's approval; (iii) the Local had terminated full-time employees, subjecting the Local to potential legal and financial liabilities; (iv) Green had filed an EEOC complaint against the Local, and while Maki "[had] no problem with that," he had "learned  that the Local Union ha[d] decided, at the President's urging, not to retain legal counsel to defend the Local against these charges," which "would seem to be a conflict of interest"; and (v) there were "serious allegations of lack [of] representation" regarding some of the Local's units.

In his deposition testimony, Maki could not recall precisely when he had learned of these new allegations, but he stated that they had been relayed to him by Subdistrict Director Woodward or another International employee. Maki

conceded that, before issuing the amended report, he had not offered Green an opportunity to respond to the new charges.

### 8.  Imposition of Administratorship

Based on the amended Maki report, Bonds, the International's District Director, sent an e-mail to President Gerard recommending that the Local be placed under an emergency administratorship.  The reasons provided by Bonds tracked in language and substance those used by Maki in his amended report.  On August 20, 2007, Gerard imposed an emergency administratorship on the Local.  Green and Roberts were suspended as officers as a result of the administratorship.

Green and Roberts filed suit to enjoin the International's actions, and the district court granted the request for injunctive relief.  The district court noted that, under the International's constitution, a full hearing was required prior to imposing an administratorship, except in cases of emergency.  The court concluded that there had not been an adequate hearing conducted in this instance and that the circumstances did not constitute an emergency.  Accordingly, the court ordered that the administratorship be dissolved and that Green and Roberts be restored to their elected positions.

### 9.  Kins Commission

The problems within the Local persisted after Green was reinstated.  On October 15, 2007, Executive Board member Margie Myers e-mailed Gerard and Bonds, among others, and informed them that Green had fired the Local's secretary. Myers added, "When are you guys going to realize that every day you wait to come and put us in administratorship she gets

stronger.  If you get in here now, you might possibly save this local and yourselves $50K that she is trying to get to her attorney to fight you!"  In response to this e-mail, Gerard wrote to Bonds, "I think we need to move qui[c]ker . . . have we done an audit . . . what are we doing."

On October 17, 2007, Green conducted a "special meeting" of the Local, allegedly without providing proper notice to members.  At this meeting, Green appointed an officer to an elected position and made decisions on the expenditure of union funds.  Bonds subsequently wrote to Green to inform her that the meeting had been unauthorized and that any actions taken at the meeting were invalid.

On October 19, 2007, Bonds wrote to Gerard requesting that another commission be convened to investigate Green's conduct.  Bonds cited the above-described unauthorized meeting, the backlog of grievances, news that HAMTC had begun exploring whether to expel the Local, and the repeated reports of conflict within the Local.  Pursuant to this letter, Gerard appointed another commission, this one chaired by David Kins.

The Kins Commission held its hearing over three days in November 2007.  In its report, the Kins Commission recommended that the Local be placed under an administratorship.  The report relied principally on the Local's failure to process grievances and the subverting of the Local's democratic processes.  With respect to the latter issue, the report cited the disenfranchisement of outlying branches, the discharge of employees without the involvement of the Executive Board, and the special meeting that Green conducted in violation of the Local's bylaws.

Following the issuance of the Kins Commission's report, an appeal panel for the International rejected the recommendation to impose an administratorship. The panel noted that, since the Kins Commission hearing, Green had made significant progress in processing grievances and had expressed a willingness to both improve internal relations and facilitate the Local's democratic functioning.

## B. Procedural History

The above facts gave rise to two separate suits that were consolidated for purposes of trial. The first suit was the previously described action filed by Green, Roberts, and the Local against the International in August 2007 seeking to enjoin the administratorship. In January 2008, the plaintiffs amended their complaint to transform the suit into a discrimination action.

The second suit was filed by Green in November 2007 against the International, HAMTC, Molnaa, Stroops, Woodward, and various individuals associated with the Local.[1] This suit is the subject of the instant appeal. Green filed an amended complaint on April 4, 2008, asserting causes of action under LMRDA §§ 101, 102, and 609, the Labor Management Relations Act ("LMRA") § 301, 42 U.S.C. § 1981, Title VII, and Washington state anti-discrimination law. On July 25, 2008, the district court dismissed Green's claims under LMRDA § 609, but permitted the remainder of her claims to proceed to trial.

---

[1] This action was initially numbered No. 07 cv-5066, but it assumed the case number of the first action when the two actions were consolidated in March 2009.

The district court consolidated the two actions on March 11, 2009.  In November 2009, the district court presided over a ten-day bench trial.**[2]**   At the close of Plaintiffs' case, Defendants moved for judgment pursuant to Federal Rule of Civil Procedure 52(c).  The district court granted Defendants' motion, finding that they had not engaged in unlawful discrimination or retaliation.  Final judgment was entered on April 12, 2010, and Green timely appealed.  We have jurisdiction under 28 U.S.C. § 1291.

## II.  STANDARDS OF REVIEW

In reviewing the district court's judgment entered under Rule 52(c), we review its findings of fact for clear error and its conclusions of law *de novo*.  *Lee v. W. Coast Life Ins. Co.*, 688 F.3d 1004, 1009 (9th Cir. 2012).  If the district court applied the correct legal rule, we may set aside its findings of fact as clearly erroneous only if they are "illogical, implausible, or without support in inferences that may be drawn from the facts in the record."  *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).  In applying this standard in the context of a bench trial, we "must constantly have in mind that [our] function is not to decide factual issues *de novo*."  *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (internal quotation marks omitted).  "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently."  *Id.* at 573–74.

---

**[2]** The plaintiffs dismissed all of the individual defendants except for Molnaa prior to trial.

With respect to the district court's dismissal of Green's claims under LMRDA § 609, we review the grant of a motion to dismiss *de novo*. *Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846, 850 (9th Cir. 2012).

## III.  DISCUSSION

### A.  Section 609 of LMRDA

The district court dismissed Green's claims under § 609 on the ground that the provision does not extend protections to union officers in their official capacities.  This question is essentially one of first impression across the federal Courts of Appeals.

The LMRDA, enacted in 1959, "was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S. 431, 435 (1982).  Title I of the LMRDA, denominated the "Bill of Rights of Members of Labor Organizations," enshrines protections for union members parallel to certain rights guaranteed under the Federal Constitution. *Id.*  To this end, §§ 101(a)(1) and (2) of Title I guarantee equal voting rights

and the rights to free speech and assembly.**[3]** *Id.* at 436 (citing 29 U.S.C. § 411(a)(1)–(2)).

Two separate provisions allow for enforcement of the rights enumerated in § 101. Section 102 creates a private right of action for the infringement of any Title I rights, providing, in pertinent part:

> Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

29 U.S.C. § 412. Section 609, which is not in Title I, similarly provides:

> It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof *to fine, suspend, expel, or*

---

**[3]** Of particular relevance, § 101(a)(2) provides, in pertinent part:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings.

29 U.S.C. § 411(a)(2).

*otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter.* The provisions of section 412 of this title shall be applicable in the enforcement of this section.

29 U.S.C. § 529 (emphasis added).

The primary difference between § 609 and § 102 is that § 609 protects against retaliation for the exercise of any right secured under the LMRDA, whereas § 102 only protects rights secured under Title I.[4] *See Finnegan*, 456 U.S. at 439 n.10.

In *Finnegan*, the Supreme Court limited the reach of both § 609 and § 102 with respect to appointed union officers. The plaintiffs in *Finnegan* were former business agents of a local who had openly supported the incumbent candidate in the local's presidential election. *See id.* at 433. The agents had been appointed by this incumbent, and when the challenger won the election, he discharged the agents from their positions. *See id.* at 434–44. The Court held that the agents could not maintain a cause of action under either § 609 or § 102. With respect to § 609, the Court held that term "discipline" as used in the provision "refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union." *Id.* at 437. In other words, § 609

---

[4] As the Supreme Court explained in *Finnegan*, the substantial overlap between § 609 and § 102 is likely attributable to hasty legislative drafting. *See Finnegan*, 456 U.S. at 439 n.10. Section 609 was originally drafted as a criminal provision. *See id.* It was later amended to allow for civil enforcement by the Secretary of Labor, and it was only a day before final passage that it was transformed into a private remedy. *See id.*

encompasses only "punitive actions taken against union members as members." *Id.* at 437–38.

With respect to § 102, the Court noted the possibility that "a litigant may maintain an action under § 102 – to redress an 'infringement' of 'rights secured' under Title I – without necessarily stating a violation of § 609." *Id.* at 439. The Court held, however, that "whatever limits Title I places on a union's authority to utilize dismissal from union office . . . , it does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." *Id.* at 441 (internal citation omitted).

In *Sheet Metal Workers' International Ass'n v. Lynn*, 488 U.S. 347 (1989), the Court declined to extend *Finnegan*'s § 102 analysis to elected union officers. The plaintiff in *Lynn* was an elected business representative who was removed from his position after opposing a measure advocated by the local's leadership. *See id.* at 349–50. He brought suit under § 102, alleging that his removal violated the free speech protections of § 101(a)(2). *See id.* at 350. The Court distinguished *Finnegan*, reasoning that, in light of the LMRDA's democratic governance goals, the retaliatory removal of an elected officer presents significantly greater concerns than does the removal of an appointed official. *See id.* at 353–55. The Court expressly noted, however, that its holding was limited to § 102, as it was not presented with a claim under § 609. *See id.* at 353 n.5.

After *Finnegan* and *Lynn*, it is established that an *appointed* union officer may not bring suit under either § 102 or § 609 for retaliation suffered in his official capacity, but an *elected* officer can bring suit under § 102 when faced with such retaliation. The question presented here, which no Court

of Appeals has addressed since *Finnegan* and *Lynn*, is whether an elected officer can also maintain an action under § 609.

Although *Finnegan* and *Lynn* are admittedly in some tension, they can be reconciled for purposes of the present inquiry. *Finnegan*'s discussion of § 609 was in absolute terms that did not admit of a distinction between appointed and elected officers. The Court emphasized multiple times that the term "discipline" as used in § 609 only encompasses actions that affect an individual's status as a *member* of a union, not as an employee. *See Finnegan*, 456 U.S. at 437–38. In contrast, the Court's discussion of § 102 was predicated almost entirely on the appointed nature of the officers in question, with the Court even acknowledging that other circumstances could exist in which union officers could maintain suit under § 102, if not § 609. *See id.* at 440–42. In *Lynn*, the Court can be viewed as delineating such circumstances. Indeed, the *Lynn* Court employed language suggesting that it is Title I rights – which are the exclusive focus of § 102, but not § 609 – that present unique concerns when dealing with elected versus appointed officers. *See Lynn*, 488 U.S. at 355 ("[T]he potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him.").

Even if doubts lingered as to the proper synthesis of *Finnegan* and *Lynn*, the question at hand can be resolved under basic principles of statutory interpretation. Congress employed language nearly identical to that in § 609 in § 101(a)(5) of Title I, which affords due process protections against disciplinary action. That section provides, "No

member of any labor organization may be *fined, suspended, expelled, or otherwise disciplined* . . . unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." 29 U.S.C. § 411(a)(5) (emphasis added). The Court has held that the phrase "otherwise discipline[d]" carries the same meaning across § 101(a)(5) and § 609. *See Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 90 n.13 (1989); *Finnegan*, 456 U.S. at 438 & n.9.

The Conference Report accompanying the final passage of the LMRDA clarified that the "prohibition [in § 101(a)(5)] on suspension without observing certain safeguards applies only to suspension of membership in the union; *it does not refer to suspension of a member's status as an officer of the union*." H.R. Rep. No. 86-1147, at 31 (1959) (Conf. Rep.) (emphasis added). Thus, it is evident that Congress did not intend for § 101(a)(5) to protect against disciplinary actions that impinge on the incidents of union employment, regardless of appointed versus elected status. And because the operative language of § 609 is to be accorded the same meaning, *Breininger*, 493 U.S. at 90 n.13, it follows that § 609 likewise does not apply to actions directed against union officers in their official capacities.[5]

---

[5] The Supreme Court endorsed this analysis in *Finnegan*. *See* 456 U.S. at 438 & n.9. It is in part for this reason that we are not bound by our previous decisions in *Grand Lodge of International Ass'n of Machinists v. King*, 335 F.2d 340 (9th Cir. 1964), and *Cooke v. Orange Belt District Council of Painters No. 48*, 529 F.2d 815 (9th Cir. 1976). In *Grand Lodge*, we extended the protections of § 609 to appointed union officers. *See* 335 F.2d at 344–46. We noted the parallel language, and clear legislative history, of § 101(a)(5), but we concluded that differential treatment was warranted for this provision and § 609. *See id.* at 341–46.

Because the alleged retaliatory actions directed toward Green impinged only upon her status as a union officer, she may not seek redress for these actions under § 609. Accordingly, we affirm the district court's dismissal of Green's § 609 claims.

## B. Judgment on Remaining Claims Entered at Trial

The district court entered judgment against Green on her remaining claims following the ten-day bench trial conducted in November 2009. These claims were brought under LMRDA §§ 101 and 102, LMRA § 301, 42 U.S.C. § 1981, Title VII, and the Washington Law Against Discrimination ("WLAD"). Green challenges the district court's rulings on each of these claims.

### 1. Legal Principles

To state a claim for a violation of LMRDA § 101(a)(2), a union member must demonstrate that: "(1) he or she

---

In *Cooke*, we assumed that *Grand Lodge*'s § 609 holding applied in the context of an elected officer (without discussion of a possible distinction between elected and appointed officers). *See* 529 F.2d at 818.

In *Finnegan*, the Court expressly rejected *Grand Lodge*'s differential treatment of § 101(a)(5) and § 609, and instead endorsed the inference that we draw today from § 101(a)(5). *See* 456 U.S. at 438 & n.9. Thus, not only did *Finnegan* overrule *Grand Lodge*'s holding with respect to appointed officers specifically, but it also directly "undercut the theory or reasoning" on which *Cooke* – through *Grand Lodge* – rested. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Accordingly, to the extent *Grand Lodge* and *Cooke* stand for the proposition that § 609 protects elected union officers in their official capacities, they have been abrogated by *Finnegan* and are not controlling. *See id.* at 899–900. Indeed, the parties do not argue to the contrary.

exercised the right to oppose union policies; (2) he or she was subjected to retaliatory action; and (3) the retaliatory action was a direct result of his or her decision to express disagreement." *Casumpang v. Int'l Longshoremen's & Warehouseman's Union, Local 142*, 269 F.3d 1042, 1058 (9th Cir. 2001) (internal quotation marks and alteration omitted).

LMRA § 301 provides federal courts jurisdiction to enforce contracts "'between an employer and a labor organization or between . . . labor organizations.'" *SEIU v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1069 (9th Cir. 2010) (quoting 29 U.S.C. § 185(a)) (alteration omitted). Green's claims under this provision proceeded at trial under the theory that the constitutions of the International and HAMTC prohibit discrimination on the basis of race and gender, or alternatively, that officials of the International and HAMTC interpreted their constitutions in bad faith. Bad faith in this context can be found "on evidence that union officials acted contrary to the [union's] best interest, out of self-interest, or in an unconscionable or outrageous way." *Teamsters Joint Council No. 42 v. Int'l Bhd. of Teamsters, AFL-CIO*, 82 F.3d 303, 306 (9th Cir. 1996).

Under § 703(c)(1) of Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for a labor organization . . . to discriminate against [] any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(c)(1). The well-established burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to a Title VII action against a labor union. *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 882 (9th Cir. 2007). Under this framework, if the plaintiff establishes a prima facie case of discrimination and the defendant produces evidence of a

legitimate, non-discriminatory reason for its actions, "the plaintiff retains [the] ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination." *Id.* at 883 (internal quotation marks and alterations omitted). The same legal principles that apply to a Title VII claim apply to a claim of race discrimination under 42 U.S.C. § 1981. *See Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003).

Finally, under the WLAD, "[t]he plaintiff's ultimate burden at trial . . . is to present evidence sufficient for a reasonable trier of fact to conclude that the defendant's alleged discriminatory motive was more likely than not a substantial factor in its adverse employment action." *Fulton v. Dep't of Soc. & Health Servs.*, 279 P.3d 500, 507 (Wash. Ct. App. 2012) (citing *Hill v. BCTI Income Fund-I*, 23 P.3d 440, 449 (Wash. 2001)).

## 2. District Court's Findings of Fact

As indicated above, Green's claims at trial all rested on the notion that Defendants retaliated against her for having engaged in protected speech or discriminated against her on account of her race or gender.[6] Based on its findings of fact with respect to the discrete incidents and controversies (described below), the district court reached a broader finding

---

[6] The one arguable exception is Green's claim under LMRA § 301 that the International and HAMTC interpreted their constitutions in bad faith. It appears, however, that any notion of bad faith would be based on the theory that the International and HAMTC were actually motivated by retaliatory or discriminatory animus. Regardless, the district court's factual determination that the International and HAMTC had legitimate, non-discriminatory reasons for their actions also defeats the suggestion that they acted in bad faith.

that Defendants had not engaged in unlawful retaliation or discrimination.    To prevail on appeal, Green must demonstrate that this ultimate factual determination was clearly erroneous.  *See Anderson*, 470 U.S. at 566; *Beck*, 506 F.3d at 882.

This would be a tall order in any context, but it is a particularly difficult task here.  The experienced district judge presided over a ten-day bench trial in a case with an extraordinarily complex and lengthy history.  The thrust of the district court's analysis was that, rather than reflecting discriminatory or retaliatory animus, the actions taken against Green were attributable to the competing interests of rival factions within the Local, or the need to alleviate the tension created thereby.  After reviewing the record and the district court's analysis of the specific incidents underlying Green's claims, we are unable to conclude that this determination was "illogical, implausible, or without support in inferences that may be drawn from the facts in the record."  *Hinkson*, 585 F.3d at 1263.   We emphasize that this would be a difficult question if presented *de novo*, but under the deferential standard of review that governs, "the district court's account of the evidence is plausible in light of the record viewed in its entirety."  *See Anderson*, 470 U.S. at 573–74.

Below we consider the district court's findings on those allegations most important to its ultimate finding of fact.

### a.   Steward Election in 2005

The district court found that there were legitimate reasons for the attempted restriction of Green's position as steward. However, we need not consider the district court's precise

findings on this issue.  All of the actors involved in the steward dispute were affiliated with the Local, and Green presents no facts establishing that the International "instigated, supported, ratified or encouraged the Local's activities or that the Local acted pursuant to its agreement with the International." *Moore v. Local Union 569 of IBEW*, 989 F.2d 1534, 1543 (9th Cir. 1993).  The International was not even affiliated with the Local for the majority of the period at issue; the steward controversy began in January 2005 and was resolved in May 2005, while the International only merged with PACE in April 2005.  Because Green is unable to connect the International (or HAMTC) to the steward allegations, the allegations cannot support a finding of liability.[7]  *See id.*

### b.  Decertification of Spokane Units

The district court found no impropriety in the International's actions relating to the decertification of two units of the Spokane branch.  Rather, the district court concluded that Green had been excluded from the meetings concerning the decertification efforts "because it was perceived that her Presidency was part of the reason for the desire to disassociate with the Local and perhaps the International."

There is ample evidence to support the district court's findings on this issue.  As noted by the district court, Green was made aware at her first Executive Board meeting that her proposed changes to union governance – particularly her plan

---

[7] The same holds true with respect to the racially charged comment made by Karen Alexander – a member of the Local's Executive Board – following Green's election as President.

to subject actions by the Executive Board to a vote at the monthly membership meetings in Richland – could lead to the Spokane units leaving the Local. Green's response was only, "OK." Green therefore cannot dispute that the members of the Spokane branch had a genuine desire to decertify from the Local that was based, at least in part, on her actions. Given such, it was reasonable for the district court to conclude that the International was acting to alleviate discord within the Local and prevent the units from leaving the International altogether.

### c. Signature Authority

This is the central allegation that involves HAMTC and Molnaa. The district court concluded that Molnaa did not have improper motives in declining to recognize Green's signature authority. In reaching this conclusion, the district court made two separate, but related findings: (1) Molnaa had a reasonable policy of only recognizing the signature authority of staff representatives; and (2) Molnaa did not want to deviate from this policy because to do so would embroil him in the ongoing dispute over the balance of power between Green and the Executive Board.

There is sufficient evidence to support these findings. It is undisputed that the prior presidents whose signature authority had been recognized were staff representatives, while the only other president who was not a staff representative did not have signature authority. Moreover, Molnaa recognized Green's signature authority immediately upon being requested to do so by the International. In this regard, Molnaa testified:

I had no idea of the authority of the president of that local. However, my experience has shown me that, you know, you've got a local level, and you work your way up to district, internationals, that the international is the parent organization. Their bylaws are based off their constitution, and they have [a] certain amount of authority, and I recognize that. And Mr. Stroops was an International representative, and if that resolved the problem, I would accept that from him.

This testimony supports the inference that Molnaa had initially declined to deviate from his standard practice because he did not want to become involved in the intra-Local dispute over Green's authority. By following the request of the International, Molnaa could continue to be seen as not taking sides in the feud.

### d. Maki Commission and Imposition of Administratorship

Like the district court, we consider the change to the Maki report in August 2007 and the resulting imposition of an administratorship to be the most troubling of the events in question. In Maki's initial report, issued on May 24, 2007, Maki found that the charges against Green were baseless. Yet less than three months later, Maki amended the report to recommend that an administratorship be imposed and that Green be removed from office.

This reversal is of concern for several reasons. As a matter of process, Maki conceded that he had not provided Green an opportunity to respond to the new allegations and

had just assumed they were true. Substantively, one of the primary allegations relied upon by Maki – that the Local was not defending itself against Green's 2007 EEOC charge – was largely not accurate. As Bonds conceded in his testimony, the Local had in fact been defended against the EEOC charge because the Gilbert & Sackman firm had submitted a response on behalf of both the International and the Local. The Local's decision was only not to authorize funds to pay for this representation.

After indicating that it had "carefully considered the Maki testimony explaining his changes and the testimony of Bonds," the district court found that the written reasons in the second Maki report (and Bonds' letter) were sufficient to justify the administratorship, and that the other problems made known to the International but not referenced in the written explanations bolstered the decision. The district court found that the administratorship had been imposed because the turmoil within the Local had simply reached a breaking point, such that action needed to be taken in the interests of the Local's members.

Despite the irregularities in the events leading to the administratorship, the district court's finding is a reasonable inference to be drawn from the record. Putting aside whether the Local defended itself against the EEOC complaint, Maki's second report and Bonds' letter also explained that Green had terminated two full-time employees, another employee had resigned, and members of the Local's committees were being removed without the approval of the Executive Board. This was uncontroverted evidence that the union was in a state of disarray.

More importantly, Bonds provided credible testimony that supported the district court's explanation. Bonds testified:

> [T]here [was] such . . . turmoil going on in that local with a great portion of the executive board being opposed to them and constantly stirring up problems that it was causing the Local not to be able to operate.
>
> And like I said, the only mechanism I have for changing things is the administratorship. I cannot come in there and take Margie Myers and remove her from a trustee, no more than I can go and take Stephanie Green and remove her as president of the Local. What I can do is appoint an administrator that can go look at the facts and try to change things and try to bring both sides together, possibly reappoint the same officers. You know, I – this was not anything more than me trying to figure out a way to fix how this local was operating. And it was not all [Green] and Dave Roberts's fault. It was everybody's fault.

Bonds later added that one of the reasons he had recommended the administratorship was that he continued to receive petitions from outlying branches seeking to decertify from the Local, just as the Spokane units had.

Given the history of events, it was permissible for the district court to credit this testimony. The record is replete with constant infighting between the competing factions within the Local, with this tension only escalating over time. The district court reasonably concluded that it was the

complications created by this tension, particularly the threat of additional units decertifying, that led that the International to determine that a change in leadership was necessary. The district court's assessment is strengthened by the fact the International had actually supported Green in various ways since her election as President. For instance, the International had overturned the decision to rerun the election (ordering that Green be seated) and had requested that HAMTC recognize Green's signature authority. Thus, there is no evidence that, prior to the administratorship, the International engaged in a pattern of discrimination or retaliation directed at Green.

Accordingly, the district court did not commit clear error in assessing the reasons for the imposition of the administratorship, which is the primary basis for Green's claims against the International.

### e. Kins Commission

The final event that must be considered is the appointment of the Kins Commission in October 2007. Green emphasizes the e-mail sent by Margie Myers to Gerard and Bonds prior to the decision to appoint the commission, in which Myers wrote, "If you get in here now, you might possibly save this local and yourselves $50K that she is trying to get to her attorney to fight you!" Gerard wrote to Bonds in response, "I think we need to move qui[c]ker . . . have we done an audit . . . what are we doing."

The district court determined that the Kins Commission was not instituted for improper reasons. Again, there is sufficient evidence to support this finding. Green contends that the inference to be drawn from the Myers e-mail is that

the International was motived by a desire to suppress her speech, but a competing inference is that the e-mail merely reinforced the dysfunctional nature of the Local, which had previously led to the administratorship being imposed in August 2007. Indeed, the problems within the Local had persisted since the administratorship was dissolved by the district court on procedural grounds. As described in Bonds' letter to Gerard recommending appointment of the Kins Commission, Green had conducted a special meeting with insufficient notice, members from outlying branches continued to complain about their exclusion from the democratic processes of the Local, and HAMTC had begun to discuss the possibility of expelling the Local. If the turmoil within the Local was the cause of the August 2007 administratorship, given the subsequent events, the same motivation almost surely drove the decision to convene another commission. The district court's findings of fact on this issue are not clearly erroneous.

### 3. Summary

Given the district court's analysis of Green's allegations, both as discrete incidents and as part of a broader course of conduct, we hold that it did not clearly err in finding that Defendants did not discriminate or retaliate against Green. Accordingly, we affirm the district court's judgment entered at trial.

## IV. CONCLUSION

For the reasons stated above, the judgment of the district court is **AFFIRMED.**