Electronically Filed
Supreme Court
SCWC-19-0000470
18-SEP-2025
09:46 AM
Dkt. 13 OP

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

MOLOAA FARMS LLC, a Hawai'i limited liability company,
Respondent/Plaintiff-Appellant,

vs.

GREEN ENERGY TEAM LLC, a Hawai'i limited liability company,
Petitioner/Defendant-Appellee

SCWC-19-0000470

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000470; CASE NO. 5CC141000188)

SEPTEMBER 18, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I. INTRODUCTION

This case concerns an agreement for an option to lease real property and the enforceability of a proposed lease attached thereto. The questions presented are: (1) whether the terms of the proposed lease were sufficiently definite to be enforceable; and (2) whether the parties intended to be bound by

the proposed lease at the time of executing the option agreement.

On September 28, 2012, Petitioner Green Energy Team LLC (GET) entered an option to lease agreement for approximately 598 acres of land owned by Respondent Moloaa Farms LLC (Moloaa). Under the option agreement, Moloaa granted GET an irrevocable one-year option to lease Moloaa's property. Attached to the option agreement was a proposed lease that included many of the terms contemplated for a potential lease agreement between the parties, including amounts for annual base rent. The proposed lease was also notably missing several terms, including an effective date.

In September 2013, GET expressed its desire to extend the option for a second year. Moloaa declined. On September 16, 2013, GET notified Moloaa that GET was exercising its rights under the option agreement.

On October 22, 2013, without any further negotiation of lease terms, Moloaa sent GET a lease agreement with a backdated effective date of October 16, 2013. Apart from the effective date, the purported lease was largely in the form of the proposed lease that had been attached to the option agreement. Terms that had been left blank in the proposed lease remained blank in the purported lease. GET and Moloaa

subsequently debated the enforceability of the purported lease. Moloaa argued that the parties' lease obligations sprung into effect the moment that GET exercised its rights under the option agreement, and that the purported lease was thus a binding, enforceable contract. GET maintained that its exercise of the option merely triggered a thirty-day period in which the parties were to negotiate further terms, and that neither the proposed lease attached to the option agreement nor the purported lease executed unilaterally by Moloaa were enforceable as to GET.

In September 2014, with the enforceability of the lease still under dispute, Moloaa filed a complaint against GET in the Circuit Court of the Fifth Circuit (circuit court) for breach of contract and specific performance. After an extended discovery period, a four-day bench trial was held in January 2019. After Moloaa rested its case, GET moved for a judgment on partial findings under Hawaiʻi Rules of Civil Procedure (HRCP) Rule 52(c) (eff. 2000), which GET and the circuit court referred to as a motion for directed verdict. The circuit court found, inter alia, that the proposed lease was missing essential terms and that the parties never intended to be bound by the proposed lease when entering the option agreement. Accordingly, the court granted GET's motion for directed verdict, awarded GET its

reasonable attorneys' fees and costs, and entered final judgment.

The Intermediate Court of Appeals (ICA) disagreed. The ICA held that the circuit court had erred in finding that the proposed lease lacked sufficient terms and that the parties had not intended to be bound should the option be invoked. Pursuant to its holding, the ICA vacated the circuit court's order, fee award, and final judgment.

GET now asks this court to reverse the ICA and affirm the circuit court. GET argues that the ICA erred in determining that the proposed lease contained all essential terms of the agreement and was inconsistent in its application of the parol evidence rule. Further, GET emphasizes that the ICA erred by conducting its own limited review of the evidence rather than giving appropriate deference to the circuit court's findings and conclusions.

Upon review of the option agreement, the proposed lease, and the record on appeal, we agree with GET and the circuit court that the proposed lease was not sufficiently definite as to certain essential terms. We further conclude that when the parties entered into the option to lease agreement, they did not intend to be bound by the attached proposed lease without further negotiation.

Accordingly, we reverse the ICA's summary disposition order and judgment on appeal, and affirm the circuit court's order granting GET's motion for directed verdict, fee award, and final judgment.

## II.   BACKGROUND

### A.   Factual Background

The facts herein are based on testimony and exhibits at trial and, unless otherwise noted, are undisputed.

Moloaa is the owner of approximately 598 acres of property (the Property) that is the subject of the disputed option agreement and proposed lease in this case. Jeffrey Lindner at all relevant times was and continues to be the owner and manager of Moloaa.

Lindner was also a manager of GET, which was established in 2006 when Lindner and Erik Knudsen came together with the idea to develop a closed-loop biomass power plant in Koloa, Kauaʻi.[1] At that time, GET was solely owned by Lindner and Knudsen through their entity Green Energy Hawaii LLC (GEH). After securing a site for the project and all of the relevant permitting, GET began seeking funding for construction.

---

[1] Operational as of 2019, the 7.4 megawatt-capacity plant operates by burning chipped wood to create steam, which then powers a turbine to generate electricity. The "closed-loop" design of the operation involves GET leasing large tracts of land near its plant on which to grow albizia, eucalyptus, and other trees for fuel.

In 2012, GET entered into negotiations for a loan agreement with Deutsche Bank Trust Company Americas (Deutsche Bank). As part of the loan agreement, Deutsche Bank required GET to show it had access to sufficient lands to support its biomass operation. GET secured the bulk of the required acreage through various leases, including a lease for a large tract of land with the State of Hawai'i. While it continued negotiations with other parties to secure the balance of the needed acreage, GET began the process of formalizing an option to lease agreement with Moloaa.

On September 13, 2012, GET's counsel circulated first drafts of an option to lease agreement and proposed lease between GET and Moloaa. The email acknowledged that there were "various deal points in the Lease that need[ed] to be completed." Lindner responded in part: "What are we negotiating on? GET doesn't need [the Property] and I don't want to do long term lease. It's only the option price."

The following week, Moloaa's counsel transmitted marked-up drafts of both the option and lease reflecting Moloaa's suggested revisions to the documents. The revisions included the entry of escalating base rental terms of $300, $500, and $750 per acre per year. Final copies of the option to

lease agreement and proposed lease were distributed to the parties for signature.

On September 28, 2012, GET and Moloaa entered into the option to lease agreement. The option agreement granted GET two "successive exclusive and irrevocable options" to lease the Property. The first option was to be valid for twelve months from the effective date and required GET to pay Moloaa a fee of $25,000 upon execution of the option agreement. Paragraph 2.c. of the option agreement provided:

> Provided that [GET] is not then in default under this Agreement, [GET] may exercise the First Option at any time during the First Option Term by giving ten (10) days prior written notice to [Moloaa] (the "Exercise Notice"). Upon the timely and proper exercise of the First Option, [Moloaa] agrees to lease the Property to [GET], on or before the date that is (30) days after [Moloaa]'s receipt of the Exercise Notice, and the Parties shall thereupon execute the Lease, which shall enter into effect on the effective date stated in the Lease. If [GET] does not timely exercise the First Option during the First Option Term as provided herein, or does not give written notice to [Moloaa] for the Second Option as provided for herein, then this Agreement shall automatically terminate on the date of expiration of the First Option Term and shall thereafter be of no further force and effect, with each Party bearing its own costs.

The second option provided GET an opportunity to extend its option to lease under certain terms for a second twelve-month period in exchange for an additional payment of $25,000. Paragraph 3.a. of the option agreement provided:

> If [GET] has not exercised the First Option but has given written notice to [Moloaa] not less than thirty (30) days prior to the date of expiration of the First Option Term that [GET] desires to exercise the Second Option and if [GET] is not then in default hereunder, [Moloaa] hereby grants to [GET] the Second Option upon the terms and conditions set forth herein.

7

Attached to the option agreement as "Exhibit B" was a proposed lease. The proposed lease included escalating base rental pricing, but lacked an effective date. It was also blank as to price and date terms for an included percentage rent provision that would require GET to pay, as additional rent, five percent of all "gross revenue" generated by the harvest of trees from the Property for use in the power plant. At the advice of their respective counsel,[2] neither GET nor Moloaa signed the proposed lease attached to the option agreement.

On September 10, 2013, having not yet secured a lease on alternative land, GET sent Moloaa a letter expressing GET's desire to extend the option for a second year. Moloaa, through Lindner, denied its obligation under the option but made no reference to the timeliness of GET's notice. On September 16, 2013, GET sent Moloaa written notice of its desire to exercise its rights under the first option. GET's notice letter provided in full:

> Dear Jeff:
>
> This is to give you notice that GET, as the Optionee under the Agreement, hereby exercises the First Option pursuant to Section 2c of the Agreement.

_____

[2] Moloaa's counsel advised, "I don't think the Lease should be executed now. It is just an Exhibit to the Option and will be executed if the Option is exercised (which apparently is very unlikely)." GET's counsel similarly advised, "The Lease attached to the option should NOT be executed; it will be executed (<u>after being finalized</u>) if the option is exercised." (Emphasis added.)

> As you know, GET is hiring external experts to review the planned equipment as well as the foreseen plantation model. We all are interested to see the results and to discuss what conclusions we can draw therefrom. We understand from your email message dated September 13, 2013 that you may prefer to await these results before deciding how to deal with the Agreement. We could agree to proceed with the Second Option or to defer the Lease itself until the parties have had an opportunity to discuss the experts' results. If you wish to proceed in one of these alternative ways, please let us know. However, to be perfectly clear, we are hereby exercising the First Option unless and until the parties agree otherwise.
>
> Sincerely,
>
> Green Energy Team LLC

On October 22, 2013, more than thirty days after GET sent its notice, and without any further communication or negotiation between the parties, Lindner sent an email to GET that simply stated "here's the executed lease." Attached to the email was a lease agreement largely in the form of the proposed lease and signed by Lindner on behalf of Moloaa. The effective date of the purported lease had been written in as "Oct. 16, 2013." Thereafter, the parties debated the enforceability of the purported lease, which GET never signed. On November 25, 2013, Moloaa followed up with a notice of default letter, which GET allegedly never received.[3]

In May 2014, Moloaa filed a complaint against GET in the District Court of the Fifth Circuit for summary possession of the Property. GET, having never signed the purported lease

---

[3] Lindner later testified that Moloaa's counsel had sent the letter to GET's former address, a P.O. Box that was only accessible by Lindner and his agents.

or taken possession of the Property, moved to dismiss the action on grounds that it had never entered into a lease agreement with Moloaa.  Subsequent to GET's motion, Moloaa stipulated to dismiss the case without prejudice.

**B.   Circuit Court Proceedings[4]**

In September 2014, Moloaa filed a complaint against GET in circuit court for specific performance and breach of contract relating to the September 28, 2012 option agreement.  In its complaint, Moloaa alleged that GET exercised the option to lease then "failed and refused to execute the lease pursuant to the exercise of the option" and further "failed to pay the amounts due and owing under the lease."  GET timely answered the complaint and shortly thereafter moved for summary judgment.

In its motion, GET argued that Moloaa could not prevail on its contract claims because, "the purported lease that [Moloaa] claims must be performed lacks essential terms and contemplates further negotiations, and therefore is not a valid and enforceable contract as a matter of law; and the option to lease agreement is an unenforceable agreement to agree."  Moreover, GET emphasized that Moloaa "did not respond to GET's notice of

_____

[4]     The Honorable Kathleen N.A. Watanabe presided.

10

exercise by October 16, 2013, much less make any effort to negotiate the missing essential terms for the lease and 'agree to lease the Property.'"  Thus, GET argued "that [Moloaa] failed to timely perform a condition precedent to GET's obligation under the option agreement to enter into the purported lease."

Finding that there were genuine issues of material fact, the circuit court denied GET's motion for summary judgment and set an initial date for a bench trial.  Over the course of nearly four years, the parties named witnesses, took depositions, and repeatedly stipulated to continue trial and extend discovery.  In June 2018, at the close of discovery, GET filed a second motion for summary judgment.  The circuit court again denied GET's motion and set trial for the week of January 22, 2019.

On January 25, 2019, after four days of trial, Moloaa rested its case and GET orally moved for a directed verdict under HRCP Rule 52(c) "on grounds that [Moloaa had] failed to demonstrate that any enforceable lease between [Moloaa] and GET exists."  The circuit court granted GET's motion, stating "that after hearing all of the testimony of all of the witnesses, . . . [t]here has been no evidence to demonstrate that any enforceable lease exists."

11

The circuit court subsequently entered its Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion for Directed Verdict After Jury-Waived Trial (Rule 52(c) Order). The circuit court made the following relevant findings and conclusions:[5]

FINDINGS OF FACT

. . . .

22. Neither GET nor [Moloaa] ever wanted or intended to actually lease and use [Moloaa]'s Property for the Plant's fuel needs.

. . . .

33. GET and [Moloaa] never negotiated or agreed to the key terms of a lease agreement for [Moloaa]'s Property. The negotiated terms concerned the Option Agreement, which was intended to show the bank that additional acreage was potentially available in a worst-case scenario of being unable to secure other lands.

34. If the parties had intended to actually enter into the Proposed Lease immediately upon the exercise of the option, they could have filled in all material terms therein, including all pricing terms, a means for calculating a start date, and executed the Proposed Lease as appended to the Option Agreement.

. . . .

40. [The parties did not] negotiate and agree to other material terms in the Proposed Lease, including the effective date, other pricing terms, or the means in which those terms would be determined.

. . . .

49. The parties did not intend for the Proposed Lease to spring into effect upon GET's exercise of either the First Option or Second Option; nor could it, because it did not reflect a final meeting of the minds on all terms.

50. Rather, if GET timely exercised one of the options granted to it, within thirty (30) days of its receipt of that exercise notice, [Moloaa] was required to notify GET of its agreement to lease the Property to GET

_____

[5] With the exception of Finding of Fact 52, each of the findings and conclusions reproduced here were challenged by Moloaa before the ICA.

upon final negotiated terms; and, thereupon, the parties would execute a final lease agreement that would be substantially in the form of the Proposed Lease.

51.    The Proposed Lease on its face is not a final agreement; it has no start date and no method for determining a start date, and it is missing key rental pricing terms.  Although the Proposed Lease sets forth the general form of a lease under the Option Agreement, those material timing and pricing provisions (as well as other terms and conditions for a lease of the Property) were left open for further negotiation between the parties, if and when GET exercised one of the options.

52.    In particular, Paragraph 3.2 of the Proposed Lease governing "Percentage Rent" contained blanks for the prices that would apply to the calculation of percentage rent, and the periods of time for which those prices would apply. . . .

53.    Neither the Option Agreement nor the Proposed Lease provides any method for determining those missing terms.  Those terms required further negotiation and agreement by the parties.

. . . .

80.    The parties had not negotiated and reached agreement on the price terms for the Annual Base Rent in the Proposed Lease.

. . . .

85.    The parties did not negotiate and did not agree to the Effective Date (or the start date) of the Purported Lease.

. . . .

CONCLUSIONS OF LAW

. . . .

14.    The Proposed Lease is not a final agreement, because, inter alia:

a.    Numerous terms of the Proposed Lease, including key pricing terms, were not negotiated and agreed to by the parties to the Option Agreement.

b.    The Proposed Lease appended to the Option Agreement is not certain and definite as to its terms and requirements.

c.    The Proposed Lease is missing essential terms and there is no express mechanism for determining some or all of those missing terms.

d.    The Proposed Lease was not executed by both parties to this lawsuit.

. . . .

18.    The Option Agreement and Proposed Lease appended thereto are ambiguous on their face; therefore, the Court may consider parol evidence.

19.    The evidence leading up to the creation of the Option Agreement demonstrates that the parties to the Option Agreement never intended to enter into or to eventually be bound by the Proposed Lease appended thereto. The Option Agreement and the Proposed Lease were intended to demonstrate to the bank that additional acreage for fuel was potentially available in a worst-case scenario and other plans for acquiring fuel fell through.

20.    Based on the Findings of Fact set forth above, neither the Proposed Lease nor the Purported Lease are final, enforceable lease agreements.

21.    The evidence demonstrates that, when entering into the Option Agreement, neither Plaintiff nor GET intended to be bound by the unsigned Proposed Lease appended thereto as "Exhibit B."

22.    [Moloaa], through its principal, Jeffrey Lindner -- who also was a manager of GET -- repeatedly represented that [Moloaa] had no intention of entering into any long-term lease for its Property.

23.    The Proposed Lease (as well as the Purported Lease) constitutes an unenforceable "agreement to agree" between [Moloaa] and GET.

24.    Therefore, because neither the Proposed Lease nor the Purported Lease are enforceable lease agreements, [Moloaa]'s claims for breach of contract and specific performance fail.

Subsequent to the Rule 52(c) Order, GET moved for an award of attorneys' fees and costs pursuant to Hawaiʻi Revised

14

Statutes (HRS) §§ 607-14 (2016)[6] and 607-9 (2016)[7].  Over the opposition of Moloaa, the circuit court granted GET $430,934.12 in fees and $16,658.04 in costs.  Final judgment was entered on June 24, 2019, and Moloaa timely appealed.

## C.    ICA Proceedings

### 1.    Moloaa's appeal to the ICA

Moloaa raised one hundred points of error challenging certain findings and conclusions in the circuit court's Rule 52(c) Order.  Rather than arguing each one individually, Moloaa organized its points of error into seven primary arguments.  Relevant to this appeal,[8] Moloaa argued that the circuit court

---

[6]    HRS § 607-14 provides, in relevant part:

[I]n all actions in the nature of assumpsit . . . there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; . . . provided that <u>this amount shall not exceed twenty-five per cent of the judgment</u>.

(Emphasis added.)

[7]    HRS § 607-9(b) provides, in relevant part:

All actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses . . . sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs.  In determining whether and what costs should be taxed, the court may consider the equities of the situation.

[8]    Moloaa's additional arguments allege that the circuit court erred in concluding that Moloaa: acted in bad faith; failed to mitigate its claimed damages; breached the option agreement; and was estopped from enforcing the proposed lease against GET.  The ICA did not reach these arguments and the parties do not address them before this court.

erred in: (1) concluding that GET and Moloaa did not intend to be bound by the proposed lease attached to the option agreement; (2) concluding that the proposed lease did not reflect the parties' final agreement because it lacked essential terms; and (3) granting GET's motion for attorney's fees and costs.

Moloaa argued against the circuit court's conclusion that no enforceable lease existed between Moloaa and GET because the lease lacked certain and definite terms. Citing to an early ICA opinion regarding the certainty required in a contract, Moloaa contended that the proposed lease at issue here was an enforceable contract because it identified the parties, described the property to be leased, and contained price terms for monthly base rent. See In re Sing Chong Co., 1 Haw. App. 236, 239, 617 P.2d 578, 581 (App. 1980).

Addressing the effect of the missing effective date and the blanks in the percentage rent provision, Moloaa argued that the first could be "easily calculated" and the second was "irrelevant." Under Bishop Trust Co. v. Kamokila Development Corp., 57 Haw. 330, 334, 555 P.2d 1193, 1196 (1976), Moloaa asserted that "where an agreement does not provide the time for performance, it must be read as requiring that performance be commenced within a reasonable time." As to the absence of any biomass price in the percentage rent provision, Moloaa pointed

16

to Lindner's declaration and testimony to suggest that the blank in the provision was "irrelevant."[9]

With regard to attorneys' fees, Moloaa argued that it had only sought damages up to the time of trial, which amounted to a claim of $976,675.13. Thus, the circuit court erred in awarding GET attorneys' fees in the amount of $430,934.12, which exceeded the twenty-five percent assumpsit cap under HRS § 607-14. Moloaa further argued that GET's request for attorneys' fee should be apportioned equally between the distinct specific performance and breach of contract claims. Finally, Moloaa argued that GET's requested fees were unreasonable and excessive based on the number of attorneys working on the case.

In its answering brief, GET argued that the circuit court was correct to conclude that the proposed lease was not an enforceable contract because it was missing certain essential terms. GET emphasized that "the Proposed Lease includes neither an effective date, nor a mechanism to determine the effective date." GET further argued that Moloaa could point to no language in the option agreement or the proposed lease to

---

[9] In a declaration attached to Moloaa's Memorandum in Opposition to GET's first Motion for Summary Judgment, Lidnder declared, "[t]he percentage rent was left blank as there was no percentage rent and Moloaa never requested or required percentage rent." Similarly, when asked at trial about Moloaa's expectation regarding percentage rent, Lindner testified, "I never had any expectation of percentage rent. We never talked about it. I never included it in my negotiation."

support Moloaa's contention "that the Proposed Lease automatically sprang into effect upon its receipt of the Exercise Notice." GET also pointed to blank spaces where biomass prices were to be entered in order to calculate percentage rent. In the absence of subsequent negotiation of biomass prices, GET insisted it was "impossible to calculate the percentage rent, and thus total rent, that would be due under the Proposed Lease."

Moreover, GET argued that both the language of the option agreement and the contemporaneous evidence showed that neither party "intended for the Option to give rise to a long-term lease absent further negotiations."

As to the fee award, GET argued that the circuit court had correctly rejected Moloaa's attempt to reduce the amount of fees recoverable "under HRS § 607-14 by mischaracterizing the amounts it actually sought to recover in this action." GET further contended that the circuit court properly determined that the Moloaa's claims for breach of contract and specific performance were inextricably linked, and that Moloaa had failed to show that the circuit court had otherwise abused its discretion in determining the reasonableness of the fees.

## 2. ICA summary disposition order

Rather than address the circuit court's challenged findings and conclusions individually, the ICA "instead addresse[d] these findings and conclusions in the context of [Moloaa's] arguments on appeal." Relying on Furuya v. Association of Apartment Owners of Pacific Monarch, Inc., 137 Hawai'i 371, 383, 375 P.3d 150, 162 (2016), and Kahawaiolaa v. Hawaiian Sun Investments, Inc., 146 Hawai'i 424, 432, 463 P.3d 1081, 1089 (2020), the ICA reviewed the Rule 52(c) Order, and "the construction and legal effect" of the proposed lease agreement de novo. The ICA determined that "[t]he circuit court erred in granting [GET]'s HRCP Rule 52(c) motion for judgment on partial findings." Specifically, the ICA held that "the circuit court erred in finding and concluding the Proposed Lease lacked sufficiently definite terms and Moloaa and [GET] did not intend to be bound by the Proposed Lease should the option to lease be invoked."[10]

The ICA concluded that neither the effective date nor the percentage rent provision required further negotiation and

_____

[10] In a footnote, the ICA acknowledged that "Moloaa also argues the circuit court erred in concluding it acted in bad faith, failed to mitigate its damages, breached the Option Agreement, and was estopped from enforcing the lease." However, the ICA ultimately determined it "need not reach these arguments" given the reasoning of its decision. Later in the order, the ICA further clarified the extent of its holding: "We do not decide whether Exhibit J-21 (which the circuit court referred to as the 'Purported Lease') is valid or binding, or any other legal issue not specifically addressed in this summary disposition order."

19

that the proposed lease was enforceable once GET gave timely notice it was exercising its option to lease. Specifically as to the percentage rent provision, the ICA determined that the omission of biomass prices created an ambiguity as to that provision and that parol evidence was "admissible to resolve that ambiguity." Relying on testimony from Lindner and the September 13, 2012 email exchange between Lindner and GET's attorney, the ICA decided that "the blanks in the Percentage Rent provision do not support a finding or conclusion that further negotiation over the essential terms of the Proposed Lease was required."

The ICA next addressed the circuit court's conclusion that the parties did not intend to be bound by the proposed lease attached to the option agreement. The option agreement included a provision that stated the agreement "shall not be amended, modified or discharged, nor may any of its terms be waived, except by an instrument in writing signed by the Parties." Interpreting this provision, the ICA concluded, "[w]hatever the parties' subjective intent may have been before the Option Agreement was executed, once it was executed the parties were bound by its unambiguous terms. Parol evidence of the parties' subjective intent is not admissible to contradict these unambiguous terms." (Citing Trs. of Est. of Bishop v. Au

(Au), No. CAAP-15-0000466, 2017 WL 6614566, at *2 (Haw. App. Dec. 22, 2017).

Pursuant to its decision, the ICA vacated the circuit court's Rule 52(c) Order, fee award, and final judgment, and remanded the case for resumption of trial.

### 3. GET's application for writ of certiorari

GET now asks this court to reverse the ICA and affirm the circuit court's Rule 52(c) Order, fee award, and final judgment. GET argues that the ICA gravely erred by reviewing the circuit court's findings of fact de novo. Further, GET argues that the ICA was inconsistent in its review of parol evidence and that the ICA's reliance on its own precedent was misplaced.

In response, Moloaa asks this court to deny GET's application and affirm the ICA's decision, which it characterizes as "a well-reasoned corrective to the lower court's flawed application of contract law principles."

### III. STANDARDS OF REVIEW

### A. HRCP Rule 52(c) Judgment on Partial Findings

"Where we have patterned a rule of procedure after an equivalent rule within the [Federal Rules of Civil Procedure (FRCP)], interpretations of the rule 'by the federal courts are deemed to be highly persuasive in the reasoning of this court.'"

Kawamata Farms, Inc. v. United Agri Prods., 86 Hawaiʻi 214, 251-52, 948 P.2d 1055, 1092-93 (1997) (quoting Harada v. Burns, 50 Haw. 528, 532, 445 P.2d 376, 380 (1968).  When reviewing a judgment on partial findings pursuant to HRCP Rule 52(c), this court has stated:

> HRCP Rule 52(c) was modeled after FRCP Rule 52(c).  See Hawaiʻi Rules Committee, Proposed Red-Line Rules and Commentary to the Hawaiʻi Rules of Civil Procedure, Rules Committee Notes to Rules 41 and 52 (July 23, 1997).  The United States Court of Appeals for the Ninth Circuit has held that "[i]n reviewing the district court's judgment entered under Rule 52(c), we review its findings of fact for clear error and its conclusions of law de novo." United Steel Workers Local 12-369 v. United Steel Workers Int'l, 728 F.3d 1107, 1114 (9th Cir. 2013).  The court also noted that "in the context of a bench trial . . . "[i]f the district court's account of the evidence is plausible in light of the record reviewed in its entirety [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.'"  Id. (alteration in original) (citation omitted).

Furuya, 137 Hawaiʻi at 382-83, 375 P.3d at 161-62 (2016)(emphasis added).

## B.  Contract Interpretation

"As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court.  The determination whether a contract is ambiguous is likewise a question of law that is freely reviewable on appeal."  Yamamoto v. Chee, 146 Hawaiʻi 527, 533, 463 P.3d 1184, 1190 (2020) (citing Brown v. KFC Nat'l Mgmt. Co., 82 Hawaiʻi 226, 239, 921 P.2d 146, 159 (1996)).  However, "[w]hen an ambiguity exists so that there is some doubt as to the intent

22

of the parties, <u>intent is a question for the trier of fact</u>."
<u>Found. Int'l, Inc. v. E.T. Ige Constr., Inc.</u>, 102 Hawaiʻi 487,
497, 78 P.3d 23, 33 (2003) (citing <u>Bishop Tr. Co. v. Cent. Union
Church of Honolulu</u>, 3 Haw. App. 624, 628, 656 P.2d 1353, 1356
(App. 1983)) (emphasis added).

## C.   Attorneys' Fees Awards

"This court reviews the denial and granting of
attorney's fees under the abuse of discretion standard."
<u>Stanford Carr Dev. Corp. v. Unity House, Inc.</u>, 111 Hawaiʻi 286,
297, 141 P.3d 459, 470 (2006) (quoting <u>Chun v. Bd. of Trs. of
Emps. Ret. Sys. of State of Haw.</u>, 106 Hawaiʻi 416, 431, 106 P.3d
339, 354 (2005)).  "A trial court abuses its discretion when it
'clearly exceeds the bounds of reason or disregards rules or
principles of law or practice to the substantial detriment of a
party litigant.'"  <u>Pub. Access Trails Haw. v. Haleakala Ranch
Co.</u>, 153 Hawaiʻi 1, 21, 526 P.3d 526, 546 (2023) (quoting <u>Maui
Tomorrow v. State</u>, 110 Hawaiʻi 234, 242, 131 P.3d 517, 525
(2006)) (brackets omitted).

## IV.   DISCUSSION

This appeal turns on the application of HRCP Rule
52(c), which provides:

> **Judgment on Partial Findings.**  If during a trial without a
> jury a party has been fully heard on an issue and the court
> finds against the party on that issue, the court may enter
> judgment as a matter of law against that party with respect
> to a claim or defense that cannot under the controlling law

be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

As an initial matter, we clarify the appropriate standard when reviewing a judgment on partial findings under HRCP Rule 52(c). Again, the federal courts' interpretation of the analogous rule, FRCP Rule 52(c),[11] is highly persuasive to our reasoning. Furuya, 137 Hawai'i at 382-83, 375 P.3d at 161-62 (citing Kawamata Farms, 86 Hawai'i at 251-52, 948 P.2d at 1092-93).

A judgment on partial findings under Rule 52(c) "is made after the court has heard all the evidence bearing on the crucial issue of fact, and the finding is reversible only if the appellate court finds it to be 'clearly erroneous.'" FRCP Rule 52(c) Advisory Committee Notes to 1991 Amendment. "Most commonly," as is the case here, "a Rule 52(c) motion is advanced by the defendant at the close of the plaintiff's case[.]" Charles A. Wright & Arthur R. Miller, Federal Practice &

---

[11] FRCP Rule 52(c) provides:

> **Judgment on Partial Findings.** If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

24

Procedure § 2573.1 (3d ed. 2025).  In this way, a "[j]udgment entered under this rule differs from a summary judgment under Rule 56 in the nature of the evaluation made by the court." FRCP Rule 52(c) Advisory Committee Notes to 1991 Amendment. Further, the Ninth Circuit has clarified that "[w]hen deciding a motion under Rule 52(c), the [trial] court is 'not required to draw any inferences in favor of the non-moving party; rather, the [trial] court may make findings in accordance with its own view of the evidence.'"  Lee v. W. Coast Life Ins. Co., 688 F.3d 1004, 1009 (9th Cir. 2012) (quoting Ritchie v. United States, 451 F.3d 1019, 1023 (9th Cir. 2006)); Wright & Miller, Federal Practice & Procedure § 2573.1 ("The trial judge is not required to draw any special inferences in the nonmovant's favor nor be concerned with whether the nonmovant has made out a prima facie case.") (footnote omitted).

As we previously recognized in Furuya, in reviewing the circuit court's judgment on partial findings under Rule 52(c), "we review its findings of fact for clear error and its conclusions of law de novo."  137 Hawai'i at 382-83, 387 P.3d at 161-62 (quoting United Steel Workers, 728 F.3d at 1114); see also Wright & Miller, Federal Practice & Procedure § 2573.1 ("A judgment on partial findings under Rule 52(c) . . . is reversible only if the appellate court finds it to be clearly

25

erroneous, even though the underlying conclusions of law are reviewed de novo.") (footnote omitted).  The Ninth Circuit has emphasized that "[i]n applying this standard in the context of a bench trial," an appellate court "must constantly have in mind that [its] function is not to decide factual issues de novo." United Steel Workers, 728 F.3d at 1114 (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)).  Indeed, an appellate court may set aside the trial court's "findings of fact as clearly erroneous only if they are 'illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'"  Id. (quoting United States v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)); cf. Surfrider Found. v. Zoning Bd. of Appeals, 136 Hawai'i 95, 107, 358 P.3d 664, 676 (2015) ("A finding of fact is clearly erroneous when the record lacks substantial evidence – i.e., credible evidence of a sufficient quality and probative value to enable a person of reasonable caution to support a conclusion – to support the finding.").

Here, Moloaa's claims against GET could not be maintained without a favorable finding on two issues: (1) whether the parties intended to be bound by the proposed lease attached to the option agreement; and (2) whether the proposed lease reflected the parties' final agreement on essential terms.

26

At the close of evidence in Moloaa's case, the circuit court made express findings that neither GET nor Moloaa ever intended to actually enter into a lease for the Property and that the proposed lease was not a final agreement on its face. On appeal, the ICA could only set aside the circuit court's findings on these issues if they were shown to be clearly erroneous. See Furuya, 137 Hawaiʻi at 382-83, 375 P.3d at 161-62. Thus, to the extent that the ICA reviewed the circuit court's judgment de novo, it did so in error.

For the reasons discussed below, we conclude that the circuit court's findings on these dispositive issues were "plausible in light of the record reviewed in its entirety." See id. at 383, 375 P.3d at 162. Accordingly, we reverse the ICA and affirm the circuit court's Rule 52(c) Order.

## A.   The Proposed Lease Lacked Sufficiently Definite Terms

GET challenges the ICA's holding that the essential terms of the proposed lease were sufficiently definite to be enforceable. It is well settled that "[t]o be enforceable, a contract must be certain and definite as to its essential terms." Boteilho v. Boteilho, 58 Haw. 40, 42, 564 P.2d 144, 146 (1977). For a lease agreement, these essential terms include "the name of the parties to the lease, the extent and bounds of the property leased, a definite and agreed term, a definite and

27

agreed price or rental, and the time and manner of payment."
Francone v. McClay, 41 Haw. 72, 78 (Haw. Terr. 1955); see In re
Sing Chong Co., 1 Haw. App. at 239, 617 P.2d at 581.  Further,
"[t]he terms of a contract are reasonably certain if they
provide a basis for determining the existence of a breach and
for giving an appropriate remedy."  Provident Funding Assocs.,
L.P. v. Garner, 149 Hawaiʻi 288, 297, 488 P.3d 1267, 1278 (2021)
(quoting Almeida v. Almeida, 4 Haw. App. 513, 519, 669 P.2d 174,
179 (App. 1983)).  However, "if the contract to lease or the
negotiations of the parties affirmatively disclose or indicate
that further negotiations, terms and conditions are
contemplated, the proposed lease is considered incomplete and
incapable of being specifically enforced."  Francone, 41 Haw. at
78 (emphasis in original).

    1.    **The effective date required further negotiation**

The ICA addressed the uncertainty of two specific
terms and their effect on the enforceability of the proposed
lease attached as Exhibit B to the option agreement.  The first
was the blank effective date.

A blank term, even a blank essential term, does not
necessarily render an agreement unenforceable.  Under our
caselaw, "where the agreement does not specify or fully express
an essential term but does specify the method of ascertaining

28

it, that term shall be deemed to be complete and certain." In re Sing Chong Co., 1 Haw. App. at 240, 617 P.2d at 581.

The proposed lease on its own provides no mechanism for ascertaining an effective date. The circuit court acknowledged as much in its findings of fact, stating: "The Proposed Lease on its face is not a final agreement; it has no start date and no method for determining a start date."

However, the option agreement provided that upon the exercise of the option, "[Moloaa] agrees to lease the Property to [GET], on or before the date that is (30) days after [Moloaa]'s receipt of the Exercise Notice, and the Parties shall thereupon execute the Lease, which shall enter into effect on the effective date stated in the Lease." The ICA read this language to indicate that "the Proposed Lease would become effective on the thirtieth day after Moloaa received the notice to exercise the option to lease," and that it would do so "without further negotiation." Accordingly, the ICA held that "the missing date did not render the Proposed Lease unenforceable."

Interpreting the same language in the option agreement, the circuit court came to an entirely different conclusion. Specifically, the circuit court found that:

> If the parties had intended to actually enter into the Proposed Lease immediately upon the exercise of the option, they could have filled in all material terms therein,

29

> including all pricing terms, a means for calculating a start date, and executed the Proposed Lease as appended to the Option Agreement.

The circuit court further concluded that both "[t]he Option Agreement and Proposed Lease appended thereto are ambiguous on their face; therefore, the Court may consider parol evidence."  We agree with the circuit court's conclusion.

"A contract is ambiguous when its terms are reasonably susceptible to more than one meaning."  Hawaiian Ass'n of Seventh-Day Adventists v. Wong, 130 Hawai'i 36, 45, 305 P.3d 452, 461 (2013).  Here, the ICA and the circuit court interpreted the language in the option agreement to mean two different things.  When the parties entered into the option agreement, it was not known if or when GET would exercise its option to lease.  Such is the nature of an option.  That there are at least two reasonable interpretations of the same contract terms suggests that, on its face, the option agreement is ambiguous as to how the effective date of the lease was to be determined.  See id.

Where ambiguity exists, "the court is permitted to consider parol evidence to explain the intent of the parties."  Id. at 45-46, 305 P.3d at 461-62; Hokama v. Relinc Corp., 57 Haw. 470, 476, 559 P.2d 279, 283 (1977) ("[W]e adopt the view allowing extrinsic evidence, i.e., all evidence outside of the writing including parol evidence, to be considered by the court to determine the true intent of the parties if there is any

30

doubt or controversy as to the meaning of the language embodying their bargain."). Further, "[w]hen an ambiguity exists so that there is some doubt as to the intent of the parties, intent is a question for the trier of fact." Found. Int'l, 102 Hawai'i at 497, 78 P.3d at 33 (citing Au, 3 Haw. App. at 628, 656 P.2d at 1356).

Here, the circuit court had four full days of trial to review evidence, including contemporaneous communications between the parties, numerous depositions, and hours of trial testimony. When its review of the evidence was complete, the circuit court found that "[a]lthough the Proposed Lease set[] forth the general form of a lease under the Option Agreement, . . . material timing and pricing provisions . . . were left open for further negotiation between the parties, if and when GET exercised one of the options." Given the foregoing, we conclude that this finding was "plausible in light of the record reviewed in its entirety" and thus should not be disturbed or reversed on review. See Furuya, 137 Hawai'i at 385, 375 P.3d at 162. Further, the circuit court's finding that the effective date of the proposed lease was still to be negotiated supports the circuit court's conclusion that the proposed lease "was not certain and definite as to its terms." See Francone, 41 Haw. at

78; In re Sing Chong Co., 1 Haw. App. at 239-40, 617 P.2d at 581.

### 2. The percentage rent terms required further negotiations

The proposed lease was also left blank as to the biomass prices used to calculate the percentage rent amount and the periods for which those prices would apply.  Recognizing that the blank terms rendered the proposed lease ambiguous as to whether the biomass prices were subject to further negotiation, the ICA turned to parol evidence to resolve the ambiguity.  On review of certain parol evidence, the ICA concluded that "the blanks in the Percentage Rent provision do not support a finding or conclusion that further negotiation over the essential terms of the Proposed Lease was required."

Where an ambiguity in a contract is found to exist, this court has held:

> [I]t is invariably necessary before a court can give any meaning to the words of a contract and can select one meaning rather than other possible ones as the basis for the determination of rights and other legal effects, that extrinsic evidence shall be heard to make the court aware of the 'surrounding circumstances,' including the persons, objects, and events to which the words can be applied and which caused the words to be used.

Hokama, 57 Haw. at 475, 559 P.2d at 283 (quoting 3 Corbin, Contracts § 536 at 28 (1960 rev.)).

This review is inclusive of "all evidence outside the writing including parol evidence."  Id. at 476, 559 P.2d at 283.

Moreover, as established above, resolving ambiguity is a question of fact best determined by the trial court. <u>Found. Int'l</u>, 102 Hawai'i at 497, 78 P.3d at 33; <u>Hanagami v. China Airlines, Ltd.</u>, 67 Haw. 357, 364, 688 P.2d 1139, 1145 ("The intent of the parties is a question of fact[.]"). Where, as here, in the context of a bench trial, the circuit court's "account of the evidence is plausible in light of the record reviewed in its entirety," an appellate court may not reverse the lower court's determinations even if the appellate court "would have weighed the evidence differently." <u>Furuya</u>, 137 Hawai'i at 383, 375 P.3d at 162.

Here the circuit court found that "[n]either the Option Agreement nor the Proposed Lease provide[d] any method for determining" the missing percentage rent terms, and "[t]hose terms required further negotiation and agreement by the parties." There is sufficient evidence in the record to establish that the circuit court's findings were not clearly erroneous and, thus, the ICA erred in substituting its own conclusion for that of the circuit court. <u>See</u> <u>id.</u>

On appeal, the ICA's review of parol evidence was limited to two items: a single email from GET's attorney and Lindner's trial testimony. The ICA relied in part on Lindner's trial testimony that he did not negotiate for percentage rent

and did not expect it to be part of the lease.  However, the ICA did not explain if or how it balanced Lindner's testimony against the testimony of GET General Manager Gilles Lebbe.  On direct examination by Moloaa, Lebbe testified specifically that GET left the percentage rent terms blank with the intent that the parties would have to negotiate those terms in the event that GET exercised the option:

> I did leave it blank, just like the effective date, so we had something to negotiate on.  And that is what we wrote in the option agreement okay.  We will enter in a lease substantially in the form as attached.  And then I made sure it was incomplete so that all parties would understand it very well that what we had to do upon -- if we ever had to execute that, we had to sit at the table because [GET] cannot pay 300, 500, $750 per acre, especially not for land that needs water and is so far away from the plant.

The ICA similarly relied on a single email sent by GET's counsel on September 13, 2012, submitted as Joint Exhibit J-6, to support its conclusion that the percentage rent provision was merely a remnant from a previous GET lease.  The ICA stated that Exhibit J-6 was "consistent with Lindner's testimony," but ignored other substantial evidence in the record that the Percentage Rent was still to be negotiated.  Elsewhere in the same email, GET's counsel expressed that "there are various deal points in the Lease that need to be completed," and specifically identified the percentage rent provision as "an item to consider."

Further, the ICA's review of the evidence does not account for Moloaa's subsequent revisions to the proposed lease. On September 17, 2012, Moloaa's counsel sent GET marked-up drafts of both the option agreement and proposed lease. Moloaa's revisions to the proposed lease included the entry of escalating base rental terms, the addition of a provision for Moloaa to retain exclusive use of buildings on the Property, and the removal of both an extended-term option and a mandatory arbitration provision. Notably, the percentage rent provision was retained and renumbered within the revised lease, though the pricing and date terms remained blank. Evidence that Moloaa had retained the percentage rent provision in its revision of the proposed lease, taken with Lebbe's testimony and further evidence that the parties were advised by counsel that various deal points were yet to be completed, supports the circuit court's finding that the percentage rent terms "required further negotation and agreement by the parties."

Based on our review of "all evidence outside the writing including parol evidence," we conclude that the circuit court's assessment of the evidence in this case is "plausible in light of the entire record." See Hokama, 57 Haw. at 476, 559 P.2d at 283; Furuya, 137 Hawai'i at 383, 375 P.3d at 162. Thus,

the ICA erred when it disregarded the circuit court's findings in favor of its own.

**B.  Whether the Parties Intended to Be Bound by the Proposed Lease**

In order to find the existence of an enforceable agreement, the record on appeal must evince a "meeting of the minds" between the parties to create a binding contract.  See United Pub. Workers, AFSCME, Loc. 646, AFL-CIO v. Dawson Int'l, Inc., 113 Hawai'i 127, 141, 149 P.3d 495, 509 (2006).  Weighing the evidence in this case, the circuit court concluded that "[t]he evidence demonstrates that, when entering into the Option Agreement, neither [Moloaa] nor GET intended to be bound by the unsigned Proposed Lease appended thereto as 'Exhibit B.'"  Our review of the record on appeal provides us with nothing to suggest that the circuit court's determination was implausible or made in clear error.  Rather, the breadth of the evidence supports a conclusion that, from the time the parties entered into a development agreement in 2010, to their last communications before executing the option agreement in September 2012, GET and Moloaa did not intend to bind themselves to a long-term lease.

Early communications establish that the object of the option agreement was strictly to satisfy the bank's requirements for extending a loan.  Specifically, Deutsche Bank wanted to be

sure that GET had access to sufficient lands to support its biomass operation.  In 2011, GET pitched the idea of an option to lease "just for the banks."  Moloaa responded with a willingness to "sign something to use for the banks," making clear that any agreement would be "for pro forma but not for practical use."

On September 12, 2012, weeks before entering the option agreement, Lindner plainly stated, "[t]here's no agreement as to leasing but you could show as an option."  GET's counsel then emailed the parties first drafts of the option agreement and proposed lease, and expressed that the parties would "need to agree on the terms of the option and the lease." Lindner replied, "What are we negotiating on?  GET doesn't need [the Property] and I don't want to do long term lease.  It's only the option price."  Again, days before executing the option agreement, counsel for both sides advised against executing the proposed lease concurrently with the option agreement.  In their correspondence, both attorneys indicated that the proposed lease would only be finalized and executed in the event that the option was exercised.  All of the aforementioned evidence supports the circuit court's plausible finding that "[n]either GET nor [Moloaa] ever wanted or intended to actually lease and

37

use [the] Property for the Plant's fuel needs." See Furuya, 137 Hawaiʻi at 383, 375 P.3d at 162.

The ICA arrived at a different conclusion altogether. Relying on a provision in the option agreement that it characterized as an "integration provision," the ICA determined that "[w]hatever the parties' subjective intent may have been before the option agreement was executed, once it was executed the parties were bound by its unambiguous terms." Relying on its own unpublished disposition in Au, the ICA further concluded that parol evidence of the parties' subjective intent was not admissible to contradict the unambiguous terms of the contract. See 2017 WL 6614566, at *2. Respectfully, we disagree.

It is well-settled that the parol evidence rule bars evidence to contradict a writing that "is found to be clear and unambiguous and 'represents the final and complete agreement of the parties.'" United Pub. Workers, 113 Hawaiʻi at 140-41, 149 P.3d at 508-09 (quoting State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc., 90 Hawaiʻi 315, 324, 978 P.2d 753, 762 (1999)). "However, it is equally well-settled that, because the parol evidence rule presupposes a valid agreement, it will not prohibit evidence showing that there was no agreement or no enforceable agreement." Id. at 141, 149 P.3d at 509.

As GET emphasizes in its application, the holding in Au is distinguishable. The court in Au specifically barred the admission of parol evidence to contradict the unambiguous terms of a settlement agreement. 2017 WL 6614566, at *2. Here, as recognized by the circuit court, the ICA, and the discussion above, the proposed lease contained terms that rendered it ambiguous on its face. Thus, it was proper for the circuit court to consider parol evidence of the parties' subjective intent. Further, there is sufficient evidence to support the circuit court's finding that the parties contemplated further negotiations on key date and pricing terms of the proposed lease. Accordingly, it cannot be said that there was a "meeting of the minds" between GET and Moloaa on all essential elements necessary to create a binding lease agreement. See United Pub. Workers, 113 Hawaiʻi at 141, 149 P.3d at 509. Therefore, we hold that the circuit court did not clearly err in finding that GET and Moloaa did not intend to be automatically bound by the proposed lease should the option to lease be invoked.

**C.  The Award of Attorneys' Fees to GET Was Reasonable**

Because the ICA vacated the Rule 52(c) order underlying the circuit court's award of attorney's fees, it also vacated the fee award without addressing the parties' arguments

on that issue. GET requests that we now reinstate the circuit court's award of reasonable fees and costs.

The award of attorneys' fees is allowed only "when so authorized by statute, rule of court, agreement, stipulation, or precedent." Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 121, 176 P.3d 91, 120 (2008) (citations omitted); Blair v. Ing, 96 Hawai'i 327, 329, 31 P.3d 184, 186 (2001). Here, GET requested fees pursuant to HRS § 607-14, which provides that reasonable attorneys' fees shall be taxed against the losing party "in all actions in the nature of assumpsit." The court determines what fee is reasonable, provided that the amount does not "exceed twenty-five per cent of the judgment." HRS § 607-14. In general, the circuit court's grant or denial of attorneys' fees is reviewed under the abuse of discretion standard. Stanford Carr Dev. Corp., 111 Hawai'i at 297, 141 P.3d at 470.

Moloaa's primary argument is that GET's fee award exceeded twenty-five percent of the damages sought by Moloaa below. Moloaa bases this argument on its contention that it sought damages only up to the point of the trial, which damages were calculated to be $976,675.13.[12] Moloaa supports this contention by reference to its opening statement in which it

---

[12] This calculation was provided by Duane Seabolt, an auditor who Moloaa called to testify as an expert witness at trial.

represented to the circuit court that it was "seeking judgment in the principal amount owed as of January 22, 2019. The measure of damages is the difference between the contract rate and the amounts received through the date of trial."

GET argues that the appropriate measure of damages is the amount of "future unpaid rent less mitigation." Hi Kai Inv., Ltd. v. Aloha Futons Beds & Waterbeds, Inc., 84 Hawaiʻi 75, 81, 929 P.2d 88, 94 (1996); see Malani v. Clapp, 56 Haw. 507, 516, 542 P.2d 1265, 1271 (1975) ("As a general rule, the measure of damages recoverable by the owner of the property for the prospective lessee's breach of contract to lease is the excess, if any, of the agreed rent over the fair rental value of the premises."). Here, that amount was calculated to be $2,834,000.[13] Thus, under GET's theory of damages, the award of $430,934.12 in attorneys' fees was well under the twenty-five per cent assumpsit cap.

In further support of its position, GET points to the language of the purported lease itself, which would allow the lessor to hold a lessee liable for "rent and other charges that would have been payable hereunder during the remainder of the Term." In response to Moloaa's contention that it sought damages only up to the time of trial, GET also cites to Moloaa's

---

[13] This calculation was also provided for the purposes of the litigation by Duane Seabolt at the request of Moloaa.

41

proposed findings of fact, conclusions of law, and order filed at the beginning of trial that would have allowed Moloaa to "come back to court periodically to establish damages" over the life of the purported lease agreement. Under the proposed order proffered by Moloaa, the circuit court would have ordered that Moloaa was "entitled to damages in the principal amount of $976,675.13" and further "damages, if any, from and after January 22, 2019, as the damages accrue." Thus, GET argues, Moloaa through its own representations to the circuit court indicated its intention to leverage a favorable judgment to hold GET liable for the full term of the purported lease.

Presented with these arguments below, the circuit court found that GET's requested fees were allowable under the twenty-five percent cap imposed by HRS § 607-14. Although the circuit court did not make a finding as to the specific amount of damages sought, it did find that "twenty-five percent of the amount sued for by [Moloaa] is in far excess of the total amount of attorneys' fees requested by GET." Based on the arguments presented and the record herein, we cannot conclude that the circuit court "clearly exceed[ed] the bounds of reason or disregard[ed] rules or principles of law or practice" in making this finding. Pub. Access Trails Hawaiʻi, 153 Hawaiʻi at 21, 526 P.3d at 546.

42

Moloaa next argues that GET's attorneys' fees should be apportioned between the specific performance and breach of contract claims. This argument lacks merit. First, our caselaw supports the conclusion that where the damages alleged are "akin to contract damages," the character of the action is "in the nature of assumpsit." Blair, 96 Hawai'i at 332-33, 31 P.3d at 189-90. Further, "it is impracticable, if not impossible, to apportion the fees between the assumpsit and non-assumpsit claims" where such claims are "inextricably linked." Id. at 333, 31 P.3d at 190. Here, the relief sought by Moloaa was in the form of money damages derived from GET's alleged failure "to perform the option and lease agreement." Indeed, both the specific performance and breach of contract claims sought to compel GET to perform its obligations under the option agreement and purported lease agreement. Thus, the circuit court did not abuse its discretion in finding that it would be "impracticable to apportion the attorneys' fees requested by GET between [Moloaa]'s assumpsit and non-assumpsit claims." See id. at 333, 31 P.3d at 190.

Finally, Moloaa summarily argues that GET's requested fees are "unreasonable and excessive" because "[t]he sheer number of individuals working on the case [led] to systematic duplication, and a massive inflation of GET's attorneys' fees."

43

Faced with the same argument below, the circuit court nonetheless found that: "[t]he number of timekeepers used by GET was not unreasonable"; "GET did not utilize 'block billing,' and utilized appropriate redactions in the documents submitted to [the circuit court]"; and "[t]he amount GET seeks for attorneys' fees and costs incurred in connection with this action are both reasonable and warranted."  The circuit court arrived at this finding after reviewing GET's fees motion, Moloaa's opposition, and all declarations and exhibits filed therein, including an itemized summary of all fees incurred by GET in defense of Moloaa's claims.

Moloaa does not contest the billing rates of GET's attorneys or raise any other specific challenges to the fee award.  Given the arguments presented, and taking into account the prolonged nature of the litigation and the record herein, Moloaa has made no showing on appeal that the amount of the fee awarded was disproportionate or unreasonable under the circumstances.  See Harada v. Ellis, 60 Haw. 467, 478, 591 P.2d 1060, 1069 (1979) (quoting Sharp v. Hui Wahine, Inc., 49 Haw. 241, 250-51, 413 P.2d 242, 248 (1966).  Accordingly, we conclude that the circuit court did not abuse its discretion by applying an erroneous view of law or evaluation of evidence in its award of attorneys' fees and costs to GET.

## V.    CONCLUSION

For the foregoing reasons, the ICA's July 30, 2024 Judgment on Appeal is reversed, and the Circuit Court of the Fifth Circuit's March 5, 2019 Final Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion for Directed Verdict Against Plaintiff After Jury-Waived Trial; May 30, 2019 Order Granting in Part and Denying in Part Defendant Green Energy Team LLC's Motion for Award of Attorneys' Fees and Costs re Granting of Defendant's Motion for Directed Verdict Against Plaintiff After Jury-Waived Trial on January 25, 2019, Filed March 19, 2019; and June 24, 2019 Amended Final Judgment in Favor of Defendant Green Energy Team LLC and Against Plaintiff Moloaa Farms LLC, are affirmed.

| | |
|---|---|
| William M. Harstad | /s/ Mark E. Recktenwald |
| Derek B. Simon | |
| for petitioner | /s/ Sabrina S. McKenna |
| | |
| George W. Van Buren | /s/ Todd W. Eddins |
| John B. Shimizu | |
| for respondent | /s/ Lisa M. Ginoza |
| | |
| | /s/ Vladimir P. Devens |

